IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DAVID GECHT, PLAINTIFF, VS. REYNALDO GUEVARA, ET AL., DEFENDANTS. | } } | 1:23-CV-01742 |
| CONS. WITH: | } } } | Judge Lindsay C. Jenkins<br>Mag. Heather K. McShain |
| RICHARD KWIL, PLAINTIFF, VS. REYNALDO GUEVARA, ET AL., DEFENDANTS. | } } } | 1:23-CV-04279 |
| CONS. WITH: | } } | |
| RUBEN HERNANDEZ, PLAINTIFF, VS. REYNALDO GUEVARA, ET AL., DEFENDANTS. | } } | 1:23-CV-15375 |

## **<u>CORRECTED AMENDED COMPLAINT</u>**

NOW COMES Plaintiff, Ruben Hernandez, by his attorneys, Dan Stohr, and Gardiner Koch Weisberg &Wrona, and complaining of Defendants Reynaldo Guevara, Geri Lynn Yanow, as special representative of Ernest Halvorsen (deceased), Alan Pergande, Michael Muzupappa, Robert Rutherford, Edwin Dickinson, Kevin Rogers, as special representative of Francis Cappitelli (deceased), the City of Chicago, Brendan McGuire, Michael Hood, and Cook County, states as follows:

### **INTRODUCTION**

1. Ruben Hernadez was wrongfully convicted of a January 1999 murder he did not commit.

2. Plaintiff was convicted based on fabricated evidence created by Defendants, including false confessions Defendants claimed to have obtained from him and two other men. Those confessions were only obtained through the use of threats, promises, and other improperly coercive tactics. The confessions were false.

3. Defendants also concealed evidence of Plaintiff's innocence in order to ensure his conviction.

4. As a result, Hernandez spent 24 years in prison for a crime he did not commit.

5. The misconduct resulting in Plaintiff's wrongful conviction was part of a now well-known pattern of illegal activity perpetrated by Defendants Guevara, Halvorsen and the other Defendants.

6. Plaintiff is one of more than 40 men and women who have had convictions on murder charges vacated after being framed in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

7. The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

8. Cook County courts have found that "Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

9. In court proceedings, Defendants Guevara, Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers. And in response to questions about whether he framed Plaintiff for the Cruz murder and subjected witnesses to physical abuse and other forms of coercive treatment in order to ensure his wrongful conviction, Defendant Guevara has repeatedly asserted his Fifth Amendment right not to incriminate himself.

10. In July 2023, more than 24 years after his wrongful conviction, Plaintiff was exonerated. His conviction was vacated and all charges against him were dropped.

11. Plaintiff now seeks justice for the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

12. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

13. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

14. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

15. Plaintiff Ruben Hernandez lived in Chicago, Illinois at the time of his arrest and wrongful prosecution and conviction. He spent 24 years wrongfully incarcerated for a murder that he did not commit.

16. At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Alan Pergande, Michael Muzupappa, Robert Rutherford, Edwin Dickinson, and other unknown law enforcement officers were Chicago Police officers, acting under color of law and within the scope of their employment. These Defendants are referred to collectively as the "Police Officer Defendants" throughout this complaint.

17. Geri Lynn Yanow, the special representative of Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative for the Estate of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

18. Kevin Rogers, the special representative of Francis Cappittelli, deceased, is named as a Defendant in his capacity as Special Representative of Francis Cappittelli, as successor in interest and to defend this action on behalf of Defendant Francis Cappittelli.

19. At all times relevant to the events described in this complaint, Francis Cappittelli and other unknown law enforcement officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

20. At all relevant times, Defendants Brendan McGuire, Michael Hood, and unknown state prosecutors were Assistant Cook County State's Attorneys. Prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in his investigatory capacity, these Defendants manufactured and fabricated coerced confessions and statements from Plaintiff and other witnesses, and they worked to maliciously prosecute Plaintiff for the Cruz murder. These Defendants are referred to collectively as the "Prosecutor Defendants" throughout this complaint.

21. The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted during their investigation of the Roberto Cruz murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of respondeat superior. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

22. Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times the employer of the Prosecutor Defendants. Defendant Cook County is a necessary party to this lawsuit.

4

23. Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

24. On January 29, 1999, Roberto Cruz ("Cruz") went to Bristol's nightclub in Chicago, Illinois.

25. Later that night, two men entered the nightclub and walked directly to a table where Cruz and his friends were sitting. The men were both heavyset, looked angry, and had an "aggressive" conversation with Cruz about money.

26. Less than an hour later, Cruz was found lying next to the driver side door of his car. He had been shot five times.

27. When Chicago Police Detectives arrived on the scene, they spoke to the nightclub bouncer, Wilfredo Rosa. Rosa told detectives that the two men he had seen arguing with Cruz at the nightclub were either "Latin or Black," one of the men was 6'1 and 350 pounds and had a goatee; and the other was 5'7 and 250 pounds.

28. Plaintiff could not have been either of these two obvious suspects because he did not match the descriptions.

### Defendant Guevara's Unlawful Interrogation of Plaintiff Results in a Purported False Confession

29. After five weeks with no progress, the Police Officer Defendants, including Defendants Guevara, Halvorsen, Pergande, and Muzupappa, conducted a series of coercive, abusive interrogations of Plaintiff and two others, David Gecht and Richard Kwil. During a single night,

the Police Officer Defendants suddenly extracted three confessions and purportedly solved the case.

30. Plaintiff was initially arrested and taken to the Fourteenth District, where he was told that he would be questioned about a different crime. Plaintiff's attorney came to the station and advised him not to make any statement, and so Plaintiff told police that he would not make any statements, invoking his right to remain silent.

31. After Plaintiff's attorney left, Plaintiff was then taken to the Area Five police station. Despite previously invoking his right to remain silent, the Police Officer Defendants, including Defendants Guevara, Halvorsen and Pergande, began interrogating him about the Cruz murder.

32. Plaintiff denied any involvement in the crime. In fact, over the course of numerous interrogations by Police Officer Defendants over many hours, Plaintiff repeatedly denied having any knowledge about the crime, or any involvement in the crime.

33. But the interrogations did not end there. Instead, the Police Officer Defendants continued their interrogations of Plaintiff, with the intent to leave him feeling helpless, hopeless, and to ultimately break his will.

34. Plaintiff was placed in a small interrogation room with nothing but a bench. The Police Officer Defendants came in and out of the room, accusing him of involvement in the Cruz murder, and rejecting his repeated denials.

35. The Police Officer Defendants yelled at Plaintiff, and threatened him.

36. Over the course of the repeated interrogations, the Police Officer Defendants presented Plaintiff with different versions of how the crime occurred and what they wanted Plaintiff to say. All of the versions involved Plaintiff committing the crime with David Gecht and Richard Kwil. These versions were all false, but the Police Officer Defendants kept trying to get Plaintiff to agree to one of the versions.

37. As this process continued for hours, Police Officer Defendants fed Plaintiff the facts of the crime and their theories of how it occurred.

38. During the course of their hours-long interrogation of Plaintiff, the Police Officer Defendants also physically abused Plaintiff, including by hitting him and choking him.

39. Defendant Hood was initially present in the interrogation room with Plaintiff and Defendant officers, and personally witnessed acts of abuse and coercion.

40. Defendant Hood expressed concern about the tactics employed by Police Officer Defendants, and left the room, intentionally "burying his head in the sand" as to abuse and coercion.

41. Defendant Hood knowingly and intentionally failed to act to prevent abuse, coercion, and the falsification of testimony and evidence.

42. Defendant Hood knew or should have known that abusive and coercive interrogation techniques are violative of civil rights and have a high likelihood of eliciting false statements.

43. Defendant Hood knew or should have known that burying his head in the sand would enable and encourage Police Officer Defendants to continue to abuse and coerce Plaintiff into falsely confessing.

44. Partway through the interrogation of Plaintiff, Defendant McGuire replaced Defendant Hood in the interrogation room. Defendant McGuire also personally witnessed acts of abuse and coercion.

45. Despite all of this, Plaintiff continued to deny any involvement in the crime, or any knowledge of the crime, and told the Police Officer Defendants that he wished to invoke his right to remain silent. The Police Officer Defendants disregarded Plaintiff's pleas.

46. Eventually, the Police Officer Defendants took Plaintiff to meet with a prosecutor, Defendant McGuire. Plaintiff was shown a typed statement. Defendant McGuire, along with

Defendant Guevara, read the typed statement to Plaintiff and told him that after they read it they wanted him to sign it.

47. The typed statement claimed that I had participated in the Cruz murder, along with David Gecht and Richard Kwil. The statement was the same version of events to which the Police Officer Defendants had previously spent hours trying to get me to agree. It was their words, not mine. The statement was false, and I refused to sign it.

48. Defendant Hood was present at the Area Five Detective Division while Plaintiff's interrogation was ongoing. Defendant McGuire actively participated as an investigator with the Police Officer Defendants in the interrogation and creation of Plaintiff's false statement incriminating himself, which he ultimately refused to sign.

49. Defendant Guevara then, in full view of Defendant McGuire, attempted to physically make Ruben Hernandez sign the statement by use of physical force and violence.

50. The false statement taken by Defendant McGuire simply repeated what the Police Officer Defendants told Plaintiff to say.

51. In fact, the statement attributed to Plaintiff consisted of Defendant McGuire walking Plaintiff through Defendants' version of events to have him confirm that version of events. Even when the written statement itself contained portions that were obviously false, and contradicted the other false statements taken from Gecht and Kwil, discussed below, Defendant McGuire simply ignored those indicators of Plaintiff's false confession and continued in his efforts to get Plaintiff to sign a false statement implicating himself.

52. Defendant Guevara refuses to deny Defendant McGuire's participation and misconduct during the interrogation of Ruben Hernandez. At Guevara's deposition, Counsel for McGuire and Hood engaged in the following line of questioning as to Defendant McGuire:

Q: Any allegation that Brendan McGuire conspired with you in relation to the rob-
-- Roberto Cruz murder investigation to create false evidence is a lie; correct?

A: Fifth.

…

Q: Any allegation that Brendan McGuire participated with you in suppressing exculpatory evidence against the suspects in the Cruz murder investigation is a lie; correct?

A: Fifth.

…

Q: Any allegation that Brendan McGuire participated with you in fabricating evidence against the suspects in the Cruz murder investigation is a lie; correct?

A: Fifth.

…

Q: Any allegation that Brendan McGuire or Michael Hood were present to observe you using physical force during any interview for the Roberto Cruz murder investigation is a lie; correct?

A: Fifth.

Q: Any allegation that Brendan McGuire or Michael Hood were present for coercion implemented during the interrogations for the Cruz murder investigation is a lie; correct?

A: Fifth.

Q: You have no personal knowledge that Brendan McGuire or Michael Hood ever conspired with any police officers during the Cruz murder investigation; correct?

A: Fifth.

Q: Any allegation that you informed Brendan McGuire or Michael Hood a statement was fabricated prior to them assisting and taking the statement is a lie; correct?

A: Fifth.

Q: Any allegation that you informed Brendan McGuire or Michael Hood that a statement was coerced prior to them assisting in taking a statement is a lie; correct?

A: Fifth.

…

Q: Any allegation that McGuire or Hood was present with you for any undocumented instances of entering interrogation rooms during the Cruz murder investigation is a lie; correct?

A: Fifth.

…

Q: The court-reported statements of Plaintiffs Kwil, Hernandez and Gecht are all in their own respective words; correct?

A: Fifth.

Q: The handwritten statement of Colleen Miller was in her own words as well; correct?

A: Fifth.

53. Defendant Guevara refuses to deny Defendant Hood's participation and misconduct during the interrogation of Plaintiffs. At Guevara's deposition, Counsel for McGuire and Hood engaged in the following line of questioning as to Defendant Hood:

Q: Any allegation that Michael Hood conspired with you in relation to the Roberto Cruz murder investigation to create false evidence is correct – is a lie; correct?
A: Fifth.
…
Q: Any allegation that Michael Hood participated with you in suppressing exculpatory evidence against the suspects in the Cruz murder investigation is a lie; correct?
A: Fifth.
…
Q: Any allegation that Michael Hood participated with you in fabricating evidence against the suspects in the Cruz murder investigation is a lie; correct?
A: Fifth.
Q: Any allegation that Brendan McGuire or Michael Hood were present to observe you using physical force during any interview for the Roberto Cruz murder investigation is a lie; correct?
A: Fifth.
Q: Any allegation that Brendan McGuire or Michael Hood were present for coercion implemented during the interrogations for the Cruz murder investigation is a lie; correct?
A: Fifth.
Q: You have no personal knowledge that Brendan McGuire or Michael Hood ever conspired with any police officers during the Cruz murder investigation; correct?
A: Fifth.
Q: Any allegation that you informed Brendan McGuire or Michael Hood a statement was fabricated prior to them assisting and taking the statement is a lie; correct?
A: Fifth.
Q: Any allegation that you informed Brendan McGuire or Michael Hood that a statement was coerced prior to them assisting in taking a statement is a lie; correct?
A: Fifth.
…
Q: Any allegation that McGuire or Hood was present with you for any undocumented instances of entering interrogation rooms during the Cruz murder investigation is a lie; correct?
A: Fifth.
…
Q: The court-reported statements of Plaintiffs Kwil, Hernandez and Gecht are all in their own respective words; correct?
A: Fifth.

Q: The handwritten statement of Colleen Miller was in her own words as well; correct?

A: Fifth.

54. Plaintiff's unsigned statement was nevertheless used to prosecute and convict Plaintiff of a crime he did not commit.

55. The Police Officer Defendants suppressed at all times the abusive techniques they had used to obtain Plaintiff's statement. In addition, the Police Officer Defendants and Prosecutor Defendants suppressed that they had created a fabricated typed statement that did not contain the words of Plaintiff, but rather the Police Officer Defendants.

56. At all times material, Defendant Hood knew or should have known that, based upon his personal observations of abusive and coercive interrogation methods, there was a high likelihood that Plaintiff's statement was false.

**Defendants Coerce David Gecht and Richard Kwil into Implicating Plaintiff**

57. Defendants also obtained false confessions from David Gecht and Richard Kwil, in which they implicated themselves as the shooter and a lookout, respectively.

58. The false confessions of Gecht and Kwil were both secured through the use of coercive tactics, including physical and psychological abuse, false promises and threats.

59. Like Plaintiff, when Gecht was questioned about the Cruz murder, he denied any involvement and any knowledge. His denials were ignored, and instead the Police Officer Defendants subjected him to repeated interrogations in which they repeatedly accused him of committing the crime, physically abused him, and promised him that if he signed a statement admitting to shooting Cruz and implicating Plaintiff and Kwil in the crime, he could go home.

60. Like Plaintiff, the Police Officer Defendants fed Gecht the facts of the crime, laying out the story they wanted him to repeat.

61. Based on the threats, promises and other coercion, Gecht's will was eventually overcome and then gave a statement similar to the one extracted from Kwil, and to the one presented to Plaintiff but that he refused to sign. Gecht repeated the facts that had been fed to him by the Police Officer Defendants.

62. The same thing happened with Kwil. When Kwil was questioned about the Cruz murder, he denied any involvement and any knowledge. His denials were ignored, and instead the Police Officer Defendants subjected him to repeated interrogations in which they repeatedly accused him of committing the crime, threatened him that if he did not give a statement against Gecht that he would never see his daughter again, and promised him that if he signed a statement against Gecht he could go home.

63. Like Gecht, the Police Officer Defendants fed Kwil the facts of the crime, laying out the story they wanted him to repeat.

64. Based on the threats, promises and other coercion, Kwil's will was eventually overborne. He agreed to give a statement similar to the one extracted from Gecht, falsely implicating Plaintiff, Kwil and Gecht in the crime. He repeated the facts that had been fed to him by the Defendants.

65. Defendants McGuire and Hood participated personally in fabricating the false incriminating statements of Gecht and Kwil, respectively.

66. Defendants McGuire and Hood were present at the Area Five Detective Division while the interrogations of Gecht and Kwil were ongoing. Defendant McGuire actively participated as an investigator with the Police Officer Defendants in the interrogation and creation of Gehct's false statement incriminating himself and Plaintiff, which Gecht was forced to sign; and Defendant Hood actively participated as an investigator with the Police Officer Defendants in the interrogation and creation of Kwil's false statement incriminating himself and Plaintiff, which Kwil was forced to sign.

67. The false statements taken by Defendants McGuire and Hood simply repeated what the Police Officer Defendants told Gecht and Kwil to say.

68. In fact, the statements attributed to Gecht and Kwil consist largely of Defendants McGuire and Hood walking them through Defendants' version of events to have them confirm that version of events. Even when Gecht and Kwil made statements that were obviously false, Defendants McGuire and Hood simply ignored those indicators that the statements were false and the produce of coercion, and continued the interrogation with the purpose of obtaining false, incriminating statements from them.

69. Gecht's and Kwil's statements, the product of physical and psychological violence, and manufactured by Defendants, were used to prosecute and convict Plaintiff of a crime he did not commit.

70. The Police Officer Defendants suppressed at all times the abusive techniques they had used to obtain these statements. In addition, they suppressed that they had fabricated these witnesses' statements.

**Colleen Miller Implicates Gecht After Being Threatened by Defendants**

71. Defendants Guevara and Halvorsen arrested and interrogated Gecht's girlfriend, Colleen Miller, who was pregnant with their child. According to police reports, within twenty minutes of being picked up by Defendants, Miller admitted to them that her boyfriend Gecht had confessed to her about the murder.

72. Miller's testimony that Gecht confessed to her was false.

73. Miller has stated on several occasions that Gecht had never confessed to her about the crime and that she knew nothing about it, and that she only agreed to sign a statement falsely claiming that he confessed because of police threats.

74. The Police Officer Defendants told Miller that they were going to charge her as an accessory to the murder and that her baby would be born in jail and taken away from her if she did not cooperate and say what they wanted.

75. Based on The Police Officer Defendants' pressure and threats, and their refusal to accept her statement that she knew nothing about the crime, Miller's will was overborne and she agreed to sign a false statement that Gecht had confessed to her.

76. Defendant McGuire, a Prosecutor Defendant, participated personally in fabricating a false incriminating statement from Miller.

77. Defendant McGuire was present at the Area Five Detective Division while Miller's interrogation was ongoing. Defendant McGuire actively participated as an investigator with the Police Officer Defendants in the interrogation and creation of Miller's false statement incriminating Plaintiff, which she was forced to sign.

78. The false statement taken by Defendant McGuire simply repeated what the Police Officer Defendants told Miller to say.

79. At his deposition in this action, Defendant Guevara refused to deny coercing and fabricating Miller's statement:

Q: Any allegation that you instructed Colleen Miller to make corrections to her statement to make it more credible is a lie; correct?
A: Fifth.

80. Defendant McGuire was present at the time Defendant Guevara instructed Miller to make corrections to her statement.

81. In fact, the statement attributed to Miller consists largely of Defendant McGuire walking Miller through Defendants' version of events to have her confirm that version of events. Even when Miller made statements that were fantastical and obviously false, Defendant McGuire simply ignored

those indicators that Miller's statement was false and coerced, and instead continued the interrogation with the purpose of obtaining a false statement from her.

82. Miller's statement, the product of physical and psychological violence, and manufactured by Defendants, was used to corroborate the false statements taken from Plaintiff, Gecht and Kwil, and to further the wrongful prosecution and conviction of Plaintiff.

83. The Police Officer Defendants suppressed at all times the coercive techniques they had used to obtain Miller's statement. In addition, they suppressed that they had fabricated her witness statement.

84. Defendant McGuire suppressed at all times the coercive techniques that had been used to obtain Miller's statement. In addition, Defendant McGuire suppressed that her witness statement had been fabricated.

**Plaintiff's Wrongful Conviction and Imprisonment**

85. As a result of Defendant's misconduct, Plaintiff was tried in the Circuit Court of Cook County.

86. Plaintiff's criminal trial began in March 2000.

87. There was no physical evidence of any kind linking Plaintiff to the scene of the crime.

88. The case against Plaintiff was based primarily on his false and fabricated confession.

89. The false confession Defendants obtained from Plaintiff was published to the jury.

90. Without the false statements and confessions extracted by the Defendants, Plaintiff would have never been convicted.

91. A judge found Plaintiff guilty of first-degree murder. He was sentenced to decades in prison.

92. After his arrest, the following decades of his life were consumed by the horror of wrongful imprisonment.

93. Because of the Defendant's misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. Plaintiff's relationships with the rest of his family were severely harmed.

94. Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions.

95. Plaintiff has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

96. Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

97. Plaintiff spent decades in prison before being released. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

98. Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

**Plaintiff's Exoneration**

99. In June, 2023, Plaintiff filed a Post-Conviction Petition for Relief from Judgment.

100.    On July 28, 2023, Judge Kenworthy of the Cook County Circuit Court vacated Plaintiff's conviction.

101.    The State entered a motion of *nolle prosequi* and dismissed all charges against Plaintiff.

**Chicago's Policy and Practice of Wrongly Convicting Innocent Persons**

**in Violation of the Constitution**

102.    The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

103.    Since the 1980s, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

104.    These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

105.    At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

106.    At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

17

107. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

108. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

109. The policies and practices of file suppression at issue in Fields applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

110. In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

111. The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

112. In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

113.     Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

114.     Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

115.     For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

116.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

117.     The Klipfel plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang

Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

118.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

119.    As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

120.    This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers

engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

121.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

122.    The conduct of live lineup, photographic, and other identification procedures.

123.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

124.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

125.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

126.    The risks of engaging in tunnel vision during investigation.

127.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

128.    The need for police officers to be trained in these areas was and remains obvious.

129.    The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

130.    The City's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in

21

this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

131. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

132. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

### Defendant Guevara's History of Framing Innocent Persons

133. As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

134. As of the filing of this complaint, more than forty men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, John Martinez, Louis Robinson, and

Plaintiff Ruben Hernandez. These men and women served hundreds of years in prison for crimes they did not commit.

135.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

136.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

137.    Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

138.    A few examples of Defendant Guevara's misconduct include:

a.    Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months

23

after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.  Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.  In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan

24

Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d.  In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.  Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.  In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.  Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.  After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded

Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

i.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l.  In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

m.  In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara

would honor this threat.

n.  In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o.  In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz

that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p.  In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q.  In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r.  In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez

27

as the offender because Guevara told him that Rodriguez was the shooter.

s.  In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

t.  In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

u.  In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

v.  In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered for all

28

witnesses to be excluded from the courtroom to prevent witness collusion.

w.  In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

x.  In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

y.  In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

z.  In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area

Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

aa. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd. In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he

complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

hh. In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was

31

the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

ii. In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

jj. In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk. In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also

used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara never took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss. In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt. In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated

eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

139.    Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

140.    In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## COUNT I

### 42 U.S.C. § 1983 – Due Process (Fourteenth Amendment)

141.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

142.    As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

143.    In the manner described more fully above, the Police Officer Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

144.    The Police Officer Defendants knew this evidence was false.

145.    The Police Officer Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

146.    The Police Officer Defendants procured supposed eyewitness identifications of Plaintiff, which they knew to be false and unreliable, using unduly suggestive procedures. Despite this, Defendants caused these identifications to be used during Plaintiff's criminal trial.

147.   In addition, the Police Officer Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that they had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

148.   In addition, based upon information and belief, the Police Officer Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

149.   The Police Officer Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

150.   The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

151.   As a result of the Police Officer Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

152.   The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II

### 42 U.S.C. § 1983 – Coerced and False Confession, Fabrication of Evidence (Fifth and Fourteenth Amendments)

153.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

36

154.    In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

155.    In addition, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

156.    In addition, these Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

157.    Specifically, these Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself in the murder of Roberto Cruz.

158.    Those false incriminating statements were wholly fabricated by these Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Cruz murder.

159.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

160.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

161.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT III

**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention (Fourth and Fourteenth Amendments)[1]**

162.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

163.    In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

164.    In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial

---

[1] Repeated to preserve for appeal.

proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

165.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

166.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

167.    The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV[2]**

**42 U.S.C. § 1983 – Failure to Intervene**

168.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

169.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants and the Prosecutor Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

170.    These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

171.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

---

[2] Repeated to preserve for appeal.

172. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

173. The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

174. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

175. In the manner described more fully above, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Cruz shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

176. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

177. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

178. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

179. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

180.    The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI

### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

181.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

182.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

183.    At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

184.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

185.     In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

186.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

187. In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

188. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to

189. adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

190. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

191. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

192. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking

authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

193.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII
### State Law Claim – Malicious Prosecution

194.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

195.     In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

196.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

197.     The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in April 2022.

198.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

199. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

200. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

201. The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

202. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Willful and Wanton Conduct

203. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

204. At all times relevant to this complaint the Police Officer Defendants and the Prosecutor Defendants had a duty to refrain from willful and wanton conduct in connection with the Cruz murder investigation.

205. Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

206.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – Civil Conspiracy

207.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

208.     As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

209.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

210.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

211.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

212.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI

### State Law Claim – *Respondeat Superior*

213. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

214. While committing the misconduct alleged in the preceding paragraphs, the Police Officer Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

215. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII

### State Law Claim – Indemnification

216. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

217. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

218. The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

219. Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants.

220. The Prosecutor Defendants were employees, members, and agents of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

221. Defendant Cook County is responsible to pay any judgment entered against the Prosecutor Defendants.

WHEREFORE, Ruben Hernandez, by his attorney Dan Stohr, and complaining of Defendants Reynaldo Guevara, Geri Lynn Yanow, as special representative of Ernest Halvorsen (deceased), Alan Pergande, Michael Muzupappa, Robert Rutherford, Edwin Dickinson, Kevin Rogers, as special representative of Francis Cappitelli (deceased), the City of Chicago, Brendan McGuire, Michael Hood, and Cook County, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, Ruben Hernandez, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dan Stohr
Attorney for Ruben Hernandez
311 N. Aberdeen Street, 3rd Flr.
Chicago, IL 60607
312-726-1180
Dan@DanStohr.com

Thomas G. Gardiner
Clayton A. Mieszala
Michelle Lagrotta
Gardiner Koch Weisberg &Wrona
121 W. Wacker Drive, Suite 3600
Chicago, Illinois 60601
(312) 362-0000
tgardiner@gkwwlaw.com
cmieszala@gkwwlaw.com
MLagrotta@GKWWLaw.com

48